**ALLENFIELD ASSOCIATES,**

v.

**The UNITED STATES.**

No. 94–1089C.

United States Court of Federal Claims.

March 2, 1998.

Richard W. Gladstone, II, Pittsburgh, PA, attorney of record for plaintiff.

S. Lane Tucker, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

YOCK, Judge.

This contract action for the recovery of current market rents for the Federal Government's use of the plaintiff's property comes before the Court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). In its Complaint, the plaintiff contends that the defendant breached its contractual duty to vacate the premises at the termination of its leasehold interest and, in the alternative, that such a failure to vacate the premises amounted to a taking of the current market rental value of the plaintiff's building without just compensation in violation of the Fifth Amendment to the United States Constitution.

After a complete and careful examination of the pleadings, briefs, and other submissions of the parties, the Court grants the plaintiff's Motion for Partial Summary Judgment as to liability and denies the defendant's Motion for Summary Judgment.

### Factual Background

In February 1977, Cedar Crest College (the College) owned the property located at 2901 Hamilton Boulevard, Allentown, Pennsylvania (the Hamilton property), which is the subject of this litigation. On February 17, 1977, Mr. Boyd Wagner obtained an option to purchase the Hamilton property from the College. In anticipation of acquiring the real estate and constructing a building on it, Mr. Wagner negotiated a lease of the property with the Federal Government, on behalf of the United States Department of Veterans Affairs (the VA); the award was made on November 11, 1977 (Compl. Ex. 4 at 3)(Pl.'s Mot. for Partial Summ. J. and Br. in Supp. at

6 and Ex. B.) On June 8, 1978, Mr. Wagner assigned his option to purchase the Hamilton property from the College to his wife, Ms. Joanna Wagner. In order to obtain nontaxable, low-interest financing through the Pennsylvania Industrial Development Authority (PIDA), Ms. Wagner assigned her option to purchase the Hamilton property to the Lehigh County Industrial Development Authority (LCIDA), a qualified authority under PIDA, which then acquired the property directly from the College. After LCIDA's acquisition of the Hamilton property, it entered into a mortgage loan to finance the construction of a building on the property.[1]

On September 12, 1978, LCIDA, as owner of the Hamilton property, leased the property back to Ms. Wagner (the LCIDA/Wagner lease). The lease, which was for an eleven-year term, expired no later than October 31, 1989, by virtue of the following provision:

> 2.1 *Term.* The term of this Lease (the "Term") shall be for a period commencing the date hereof and ending at midnight on October 31, 1989, unless sooner terminated in accordance with the terms hereof.

(Compl. Ex. 3 at 4.) The LCIDA/Wagner lease also provided Ms. Wagner with an option to purchase the Hamilton property after the mortgage note for the construction of the building on the property had been paid in full.[2] A Memorandum of Lease summarizing the LCIDA/Wagner lease was recorded on September 21, 1978, with the Recorder of Deeds of Lehigh County, Pennsylvania.

Subsequently, Ms. Wagner (by the prior negotiations between Mr. Boyd Wagner and the Federal Government) subleased the Hamilton property to the VA for use as an outpatient clinic for a fifteen-year term beginning February 11, 1979, and ending February 10, 1994, at an annual rate of $259,-

---

1. The completed building had 29,355 square feet of usable space.

2. Although Ms. Wagner was only the lessee of the property, her actions were consistent with that of an owner. She guaranteed payment to the mortgagee bank and became personally liable for any excess construction costs for building on the property. In addition, she assumed liability for all real estate taxes, all fire and liability insurance, and all maintenance and repair work. She

also represented herself as the owner of the Hamilton property on the sublease with the VA. (Compl. Ex. 4 at 1.) Yet, despite her apparent authority as the owner, Ms. Wagner at all times remained only a lessee of the property to retain the nontaxable, low-interest financing of PIDA through the record owner, LCIDA. Ms. Wagner, therefore, never had the authority to sublease the property beyond her lease expiration date of October 31, 1989.

791.75 (the Wagner/VA lease).[3] The lease also contained the following renewal option:

5. This lease may be renewed at the option of the Government, for the following terms and at the following rentals:

For five (5) years from February 11, 1994 through February 10, 1999 at an annual rental of $318,501.75 ($10.85 per sq. ft.), at the monthly rate of $26,541.81.

(Compl. Ex. 4 at 1.)[4]

On June 15, 1982, Ms. Wagner assigned her purchase option in the Hamilton property and all of her interests in the LCIDA/Wagner and the Wagner/VA leases to 21st Century Equity, Inc. (21st Century). On June 24, 1982, 21st Century, in turn, assigned the purchase option and sublet the Hamilton property to the plaintiff, Allenfield Associates (Allenfield),[5] who then assumed and adopted the Wagner/VA lease (now the Allenfield/VA lease). LCIDA remained the owner of the Hamilton property after the assignment of the purchase option and leases to 21st Century and Allenfield.

On October 31, 1989, the LCIDA/Wagner lease expired along with PIDA's tax-free, low-interest financing of LCIDA's mortgage note. As a result, on November 1, 1989, LCIDA's mortgage note became due in full with over $1 million in outstanding principal. (Haney Aff. in Supp. of Allenfield's Mot. for Summ. J. at 4, para. 18–19.) Because the VA's below market rental rate was based on PIDA's financing, the loss of that special financing and Allenfield's inability to pay the mortgage note in full prompted the mortgagee to begin foreclosure proceedings. Allen-

field's counsel assessed the situation as follows:

After midnight of [October 31,] 1989, the tax-free financing became due. Over a million dollars of debt, tax-free debt, that was once a benefit became a burden to Allenfield. That's what drove Allenfield into Bankruptcy to protect its purchase option [of the Hamilton property]. The general partner of Allenfield through its president, Bruce Haney, was desperate. The first mortgagee had scheduled a foreclosure on the building for June 21, 1990. Allenfield would have lost its purchase option on the building.

(Tr. at 20.)[6] On June 4, 1990, Mr. Bruce Haney, in an effort to gain refinancing and forestall filing for bankruptcy, requested by letter that the VA exercise its option to renew the lease at a new reduced rental rate for a five-year term beginning July 1994 and ending February 10, 1999. (Def.'s Proposed Findings of Uncontroverted Fact and App., App. at 1–2.) The VA refused to exercise its renewal option but reserved the right to do so at a later time.[7] On June 21, 1990, after the VA refused to commit to the lease renewal and, on the eve of foreclosure, Allenfield filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the bankruptcy court). Allenfield's Chapter 11 reorganization plan was confirmed on or about August 25, 1994.

On January 15, 1992, Allenfield filed an adversary action in the bankruptcy court against the VA seeking a declaratory judgment that the Allenfield/VA lease expired on

---

3. The Wagner/VA lease was backdated to November 11, 1977, but did not begin until February 1979.

4. The VA was able to obtain low lease rates because of Ms. Wagner's ability to obtain nontaxable, low-interest financing through PIDA and LCIDA. By a subsequent supplemental lease, the VA's rental rates were increased to an annual rate of $266,684.55 ($9.08 per square foot) and for the five-year renewal period at an annual rate of $325,394.55 ($11.08 per square foot) (Def.'s Proposed Findings of Uncontroverted Fact and App., App. at 6).

5. Allenfield is a Pennsylvania limited partnership formed in 1982.

6. References to the transcript of the October 18, 1996 hearing will be designated as "Tr. at ——."

7. The VA reasoned that despite any benefit either party should receive from the VA exercising its option to renew its lease, such action would be premature in June 1990, because their current lease did not expire (according to the VA's position) until July 1994. In addition, the VA charged that Allenfield had not maintained the premises as required by the lease nor had it been able to keep current with the mortgage payments. (Def.'s Proposed Findings of Uncontroverted Fact and App., App. at 4.)

October 31, 1989, which is the same date that the prime lease between LCIDA and Ms. Wagner had expired. Specifically. Allenfield argued to the bankruptcy court that the Allenfield/VA lease was a sublease subject to the terms of the LCIDA/Wagner lease, which expired on October 31, 1989; therefore, the Allenfield/VA lease also terminated on October 31, 1989. As a result, the VA became a holdover tenant due to its failure to vacate the Hamilton property by October 31, 1989. The bankruptcy court disagreed with Allenfield's contentions, granted judgment for the VA, and held that the Allenfield/VA sublease was valid and that Allenfield was bound by its terms.

Allenfield appealed the bankruptcy court's decision to the United States District Court for the Eastern District of Pennsylvania (the district court). Allenfield argued that Pennsylvania law—which states that a sublease is subject to the provisions of the prime lease—applied, thereby making the VA a holdover tenant. On September 27, 1993, the district court, while agreeing with this tenet of Pennsylvania law as argued by Allenfield, ruled in favor of the Government. Specifically, the district court found:

> The prime lessors as to Allenfield—the LCIDA and 21st Century Equity, respectively—have not sought to enforce a reversionary interest. Accordingly, the VA's leasehold interest remains undisturbed. The point is that Allenfield, as the sublessor of the VA, does not acquire the right to terminate its lease with the VA prematurely merely because the prime lease expired. Rather, the right to terminate the sublease belongs to the prime lessor should it elect to declare a forfeiture or otherwise enforce its rights under the prime lease. *See, e.g., Wehrle v. Landsman,* 23 N.J.Super. 40, 46, 92 A.2d 525, 528 (1952). Under these circumstances, Allenfield cannot manipulate the prime lease and thereby extinguish the VA's otherwise valid interest.

*Allenfield Assocs. v. United States,* 159 B.R. 446, 449–50 (E.D.Pa.1993), *aff'd,* 27 F.3d 555 (3d Cir.1994) (footnote omitted). The district court, therefore, affirmed, albeit on other grounds, the bankruptcy court's decision. On May 25, 1994, the United States Court of Appeals for the Third Circuit affirmed the district court's decision without opinion.

By letter dated December 9, 1993, the VA exercised its option to renew the lease for an additional five-year term:

> The Government hereby renews the above lease [for the Hamilton property and building], as it may have been amended or supplemented, for the premises and covering the period indicated [beginning February 11, 1994 and ending February 10, 1999].
>
> This notice is given in conformity with the Government's option of renewal contained in the lease.

(Def.'s Proposed Findings of Uncontroverted Fact and App., App. at 5.)

On September 8, 1994, Allenfield exercised its option to purchase the Hamilton property and acquired title and all reversionary interests in the property for approximately $900,-000. As the new fee owner of the property, Allenfield, by letter dated September 21, 1994, requested that the VA vacate the Hamilton property by October 15, 1994, "so that current market rents may be realized for the 29,355 net usable square feet in Allenfield's Building." (Compl.Ex. 5.) Allenfield stated therein that "if the Government fails to so vacate Allenfield's Building, the Government will thereafter be a holdover tenant taking the current market rental value of Allenfield's Building (at least $16.50 per square foot per year), thereby Constitutionally and contractually owing Allenfield rent of at least $40,363 per month ($16.50 × 29,355 [divided by] 12) during the Government's holdover." (*Id.*) Allenfield's position was that "the Government's Sublease, backdated to November 11, 1977, expired with the expiration of the September 12, 1978 Primary Lease [between LCIDA and Ms. Wagner]." (*Id.*)

The VA refused to vacate, stating in a letter to Allenfield's attorney, dated September 29, 1994, that "we [the VA], of course, disagree with your position in light of prior litigation. We do not believe we are a holdover tenant and do not plan to move at this time." (Compl.Ex. 6.) On October 3, 1994, in response to the VA's refusal to vacate, Allenfield filed a claim with the VA, pursuant to

the Contract Disputes Act of 1978, 41 U.S.C. § 605 (1994), for:

> a final decision on Allenfield's claim made hereby that the United States of America (the "Government") is obligated to pay Allenfield current market rent of at least $16.50 per square foot per year, or $40,363 per month, for Allenfield's Building's 29,-355 net usable square feet as a holdover tenant after October 15, 1994, the Government having advised by your September 29, 1994 letter that the Government will not vacate Allenfield's above-referenced Building as requested by Allenfield's September 21, 1994 letter.

(Compl. Ex. 1 at 1.) By letter dated December 21, 1994, the VA responded as follows:

> In response to your letter dated October 3, 1994, the Department of Veterans Affairs does not see a need for a Final Decision, since the issue of the validity of Allenfield's present lease has already been decided in VA's favor, in the United States District Court for the Eastern District of Pennsylvania, Civil Act No. 93–3878, [159 B.R. 446 (1993)] (the "District Court Action"). The District Court Action was affirmed by the United States Court of Appeals for the Third Circuit at Case No. 93–1984 [27 F.3d 555 (1994)].

(Compl.Ex. 2.)

On December 22, 1994, after the VA's refusal to consider/denial of Allenfield's claim, Allenfield filed its current Complaint to:

> recover current market rent of at least $16.50 per square foot per year, or $40,363 per month, as a result of the Government's being a holdover tenant after October 15, 1994 by virtue of the Government's Sublease having expired and the Government's continuing to occupy Allenfield's Building's 29,355 net usable square feet notwithstanding Allenfield's request that the Government vacate Allenfield's Building by October 15, 1994, thereby causing the Government to Constitutionally and contractually owe Allenfield the aforesaid current market rent after October 15, 1994.

(Compl. at 1.) As of this date, the VA continues to occupy the building on the Hamilton property and makes rental payments directly to the mortgagee.

## Discussion

In its Motion for Summary Judgment, the defendant contends that its lease with Allenfield is valid until February 10, 1999, and that there is no legal impediment to excuse the plaintiff from meeting its obligations under the lease. The defendant argues that the expiration of the LCIDA/Wagner lease had no effect on the Allenfield/VA sublease and that the plaintiff cannot manipulate the provisions of the sublease merely because the terms are now economically unfavorable. In addition, the defendant argues that Pennsylvania law, which states that a sublease for realty expires with the expiration of the prime lease regardless of the term set forth in the sublease, is inapplicable to the plaintiff's lease with the Federal Government. Finally, the defendant contends that the September 27, 1993 decision of the district court does not apply to this case because "[t]he district court was neither presented with, nor did its holding apply to, the situation where the sublessor is also the owner/prime lessor and is attempting to manipulate the prime lease to the disadvantage of the sublessee." (Def.'s Mot. for Summ. J. at 3.)

In its Brief Opposing Defendant's Motion for Summary Judgment, the plaintiff counters that Pennsylvania landlord-tenant law, which states universally accepted principles of property law, does apply because federal law is not determinative of the issues before the Court. In addition, the plaintiff argues that it did not manipulate or prevent performance of the LCIDA/Wagner lease because the lease expired according to its own terms.

In its Motion for Partial Summary Judgment, the plaintiff contends that Pennsylvania landlord-tenant law applies to guide the federal law regarding its lease with the Federal Government. In addition, the plaintiff argues that the defendant breached its contractual duty when it failed to vacate the Hamilton property at the expiration of the lease and, therefore, owes damages in the amount of the current market rental value of the building. Moreover, the plaintiff contends that the September 27, 1993 decision of the district court is *res judicata* on the par-

ties before this Court. The plaintiff argues that the district court's determination that "the right to terminate the [VA's] sublease belongs to the prime lessor should it elect to declare a forfeiture" now applies to the plaintiff because it, "as the new prime lessor, has elected to terminate the Wagner/VA Sublease." (Pl.'s Mot. for Partial Summ. J. at 11–12.)

In its Opposition to Plaintiff's Motion for Partial Summary Judgment, the defendant contends that it has a valid and enforceable lease until February 10, 1999, because: (1) federal contract, not Pennsylvania, law applies; (2) there is no longer any sublease subject to the prime lease due to a merger of the plaintiff's interests as owner, prime lessor, and sublessor when it acquired title to the property; and (3) the plaintiff cannot attempt to manipulate the prime lease to the disadvantage of the sublessee, the VA.

In its Supplemental Brief, the plaintiff clarified its position as seeking a decision that the VA breached its contractual duty to vacate the premises and is now a tenant at sufferance with an obligation to pay the plaintiff the reasonable rental value of the Hamilton property from October 15, 1994, until it vacates the property. The plaintiff also argued that the defendant's argument in favor of merger is not applicable because merger is not favored in the law. In its Response to Plaintiff's Supplemental Brief, the defendant contends that the plaintiff's tenancy at sufferance argument is inapplicable because Allenfield expressly assumed and adopted the VA's lease. In addition, the defendant states that its manipulation argument centered around the district court's discussion of manipulation, not any legal theory of manipulation. Specifically, the defendant's manipulation argument relates to "Allenfield's attempt to manipulate its role in order to acquire rights that a predecessor in interest, namely LCIDA, might have had, in order to harm the Government, the party with which it freely contracted." (Def.'s Response to Pl.'s Supp. Br. at 7.)

The central issue in this case is whether a valid lease exists between the plaintiff, Allenfield, and the defendant, the VA, thereby binding the plaintiff to the terms of the lease, or whether the Allenfield/VA sublease expired with the prime lease on October 31, 1989. Specifically, this Court must determine whether or not the plaintiff's incidence of ownership of the property after September 8, 1994, gave it sufficient authority to evict the VA and to demand a higher fair market value rent for the period that the VA holds over after October 15, 1994, the date the VA was to vacate the property.

Summary judgment is properly granted when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). For a dispute over a material fact to be "genuine," the evidence must be such that it could cause a reasonable trier of fact to return a judgment for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In deciding a motion for summary judgment, all of the facts must be construed in a light most favorable to the nonmoving party, with all reasonable inferences drawn in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Moreover, once a moving party has supported its motion with affidavits or other evidence that would establish its right to summary judgment, the nonmoving party must respond with countering evidence sufficient to create a genuine issue. *Id.* at 248–49, 106 S.Ct. at 2510–11; *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). In countering a motion for summary judgment, the nonmoving party cannot rest on mere denial and self-serving conclusions unsupported by specific facts contained in the record. *Sweats Fashions, Inc.*, 833 F.2d at 1562; *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

Where both parties have moved for summary judgment, each party's motion must be evaluated on its own merits, drawing all reasonable inferences against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). A court is not

compelled to decide a case on summary judgment simply because both parties have submitted summary judgment motions. *Id.* However, if the record could not lead a rational trier of fact to find for the nonmoving party, there are no genuine issues, and the motion must be granted. *Id.; Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356.

This case is ripe for summary disposition. As noted, the essential issue revolves around the validity of the alleged lease between Allenfield and the VA. As contract (and lease) interpretation issues are matters of law, summary disposition is generally appropriate. *Hendricks v. United States,* 10 Cl.Ct. 703, 706 (1986); *A & K Plumbing & Mechanical, Inc. v. United States,* 1 Cl.Ct. 716, 719 (1983). There remain no genuine issues of material fact that would preclude summary judgment at least as to liability at this juncture.

### A. *Res Judicata* and Collateral Estoppel.

In its motion for summary judgment, the defendant contends that the district court's prior decision in this case is not applicable to the issues before the Court because "[t]he district court was neither presented with, nor did its holding apply to, the situation where the sublessor is also the owner/prime lessor and is attempting to manipulate the prime lease to the disadvantage of the sublessee." (Def.'s Mot. for Summ. J. at 3.) The plaintiff, in its motion for partial summary judgment, contends that the prior decision of the district court is *res judicata* on the parties before this Court. As discussed herein, this Court generally agrees with the defendant on this point and finds that the prior decision of the district court is not *res judicata* on the parties in this action.

▆▆▆▆ Under the doctrine of *res judicata,* or claim preclusion, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). *Res judicata* prevents the relitigation of all claims that were litigated and all claims that could have been litigated. *DeVries v. United States,* 28 Fed.Cl. 496, 498 (1993). Moreover:

Courts have generally considered three factors to determine whether *res judicata* applies: (1) whether the parties are legally identical, *Bass v. United States,* 11 Cl.Ct. 295, 299 (1986); (2) whether the transactions underlying the claim are substantially related, *Nevada [v. United States],* 463 U.S. [110,] 131 n. 12 [103 S.Ct. 2906, 2919 n. 12, 77 L.Ed.2d 509 (1983)]; and (3) whether the non-movant had a "full and fair opportunity to litigate" the claim, *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979).

*Security Bank and Trust Co. v. United States,* 26 Cl.Ct. 693, 695–96 (1992); *DeVries,* 28 Fed.Cl. at 498; *Rogers v. United States,* 15 Cl.Ct. 692, 696 (1988).

▆▆▆▆ In the present action, the first requirement has been met. The same parties have already faced one another in the bankruptcy/district court action. *See Rogers,* 15 Cl.Ct. at 696. The plaintiff, however, is unable to establish the second and third requirements of *res judicata* in order to bar relitigation of its claims in this Court. With regard to the second requirement, that the transactions underlying the claim are substantially related, *res judicata* prevents a party from asserting the same transactional facts in a second action that were presented in the first action under the label of a different cause of action. In determining whether the transactional facts are the same, this Court must ascertain whether or not the facts are related in time, space, origin, or motivation and whether or not those facts can be treated together as a convenient unit. *Bass v. United States,* 11 Cl.Ct. 295, 299 (1986). The present action does not rest on the same facts as the prior district court action, and the district court action failed to embrace the merits of the present action. *See DeVries,* 28 Fed.Cl. at 498. Specifically, the allegations in the present Complaint surrounding the plaintiff's acquisition of the Hamilton property, which the plaintiff contends allowed it to terminate the VA's tenancy at sufferance, could not have been raised in the district court action because Allenfield did not exercise its option to purchase the property until *after* the September 27, 1993 decision by the district court.

In addition, the present action does not rest on the common core or nucleus of facts upon which the district court's decision was based. Specifically, the district court's decision in favor of the Government relied on the fact that the plaintiff was merely the sublessor at the time of that action and did not have the right to terminate the sublease to the prejudice of the sublessee. However, in the present action, the plaintiff is now the entire owner of the fee and contends that it has the right to enforce its reversionary interests in the property by terminating the VA's tenancy at sufferance. The change in the plaintiff's legal status, from sublessor to owner of the property in fee, is sufficiently significant to give rise to a different common core or nucleus of facts. *See Narramore v. United States,* 30 Fed.Cl. 383, 388 (1994). Therefore, the transaction underlying the present action is not exactly the same as the transaction underlying the previous district court action given the sequence of events that occurred after the district court rendered its decision on the merits. Thus, the present claim does not arise from the same transactional facts as the district court action, and, therefore, the second requirement necessary to establish *res judicata* has not been met.

Finally, the third requirement that the parties have a full and fair opportunity to litigate has not been met. Because the plaintiff had not exercised its option to purchase the Hamilton property at the time of the district court action, but did so before it commenced the present action, it now stands in a different legal capacity than it did before the district court. Therefore, the parties did not have a full and fair opportunity to litigate the issues as they relate to the plaintiff's capacity as the legal owner of the property. Thus, the plaintiff fails to meet the requirements necessary to establish *res judicata,* and, therefore, the decision of the district court is not a bar to litigating any of the present action.

■ This Court also finds that collateral estoppel, or issue preclusion, is not applicable in this case. Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana,* 440 U.S. at 153, 99 S.Ct. at 973. The policy behind the doctrine is that if a party has litigated and lost an issue, that party cannot demand that the issue be relitigated in a subsequent action. *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983). The requirements for the application of collateral estoppel are as follows:

(1) The issues to be concluded are identical to those involved in the prior action; (2) in that action the issues were raised and "actually litigated"; (3) the determination of those issues in the prior action was necessary and essential to the resulting judgment; and (4) the party precluded * * * was fully represented in the prior action.

*Id.* & n. 4.

■ In the present action, collateral estoppel is not applicable to bar litigation of the issues raised by the parties. Specifically, the plaintiff did not present or litigate the identical issues of the present action in the district court action. Indeed, the operative facts and legal principles in both cases are different given the plaintiff's purchase of the Hamilton property *subsequent* to the district court's decision. Moreover, the parties did not have a full and fair opportunity to litigate this issue for the same reason; namely, because the plaintiff had not yet exercised its option to purchase the property. *See Security Bank and Trust Co.,* 26 Cl.Ct. at 697; *Narramore,* 30 Fed.Cl. at 390–91. Because the present action does not involve the same issues as the prior district court action, collateral estoppel will not be applied in this case.

## B. Applicable Law.

■ In its Motion for Summary Judgment, the defendant contends that Pennsylvania law, which indicates that a sublease expires when a prime lease expires, is inapplicable to the current action because:

It is well settled that contracts to which the government is a party—and though a lease may concern and convey a property

interest it is also very much a contract—are normally governed by federal law, not by the law of the state where they are made or performed.

(Def.'s Mot. for Summ. J. at 7) (quoting *Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1298 (Fed.Cir.1986)). However, the defendant failed to quote the critical language in *Prudential Ins. Co.* that is applicable to the present action:

> To the extent existing federal law is not determinative of the issue and permits an area of choice between the merits of competing principles, the best in modern decision and discussion, including the general principles of contract and landlord-tenant law, should be taken into account.

*Prudential Ins. Co.*, 801 F.2d at 1298.

 In this case, although the defendant contends that "[t]he Court should apply the principles of Federal contract law" because it involves a lease with the Federal Government, it does not cite to and this Court cannot discover any federal common law that would be determinative of the specific issues now before this Court. (Def.'s Response to Pl.'s Supp. Br. at 10); *see Bixby Ranch Co. v. United States*, 35 Fed.Cl. 674, 678–79 (1996); *Sun Cal, Inc. v. United States*, 25 Cl.Ct. 426, 428 (1992). Therefore, in resolving the merits of this case, this Court will take into account "the best in modern decision and discussion, including the general principles of contract and landlord-tenant law," including, but not limited to, the principles of property law regarding the interaction between prime leases and subleases. *See Prudential Ins. Co.*, 801 F.2d at 1298; *Nebco & Assocs. v. United States*, 23 Cl.Ct. 635, 641–42 (1991); *Keydata Corp. v. United States*, 205 Ct.Cl. 467, 482–83, 504 F.2d 1115, 1123–24 (1974) (applying the general rules applicable to leases, including the Restatement (Second) of Property, not the special Massachusetts rule that was different from the generally followed rule). Pennsylvania landlord-tenant law regarding the expiration of subleases will apply because it fully conforms to the general principles of landlord-tenant law that represent "the best in modern decision and discussion." The applicable Pennsylvania law clearly states that "[a]ny

person who is a sublessee shall be subject to the provisions of the lease between the lessor and the lessee." 68 PA.CONS.STAT.ANN. § 250.105 (West 1994); *Allenfield Assoc. v. United States*, 159 B.R. 446, 449 (E.D.Pa. 1993), *aff'd*, 27 F.3d 555 (3d Cir.1994); *cf. Security Life and Accident Ins. Co. v. United States*, 357 F.2d 145, 148–49 (5th Cir.1966) (applying Alabama law to a federal lease because it fully conformed to the general principles of contract law that normally applied against private citizens in the same circumstances); *see also Keydata*, 205 Ct.Cl. at 482–83, 504 F.2d 1115 (discussing *Security Life and Accident Ins. Co. v. United States* ).

In its Opposition to Plaintiff's Motion for Partial Summary Judgment, the defendant contends that the general principle of law governing the validity of subleases should not be followed by this Court because:

> The Federal Government's compelling need for uniformity in the interpretation and performance of its contracts is obvious. It cannot be expected to allow its unambiguous lease contracts to be subject to limitations imposed by the myriad laws of the fifty states as well as the various American territories and protectorates. This would result in the expenditure of great effort and money just to learn and monitor the labyrinth of laws and their possible effects upon the vast numbers of Federal leases.

(Opp. to Pl.'s Mot. for Partial Summ. J. at 7.)

The defendant's argument fails for two reasons. First, the defendant is not "subject to limitations imposed by the myriad laws of the fifty states as well as the various American territories and protectorates," but is subject to federal common law taking into account "the best in modern decision and discussion." The principle of property law, which states that the term of a sublease is limited by the term of the prime lease, is not confined to Pennsylvania law but is a generally accepted principle of law applicable to all leases, including leases in which the Federal Government is a party. Therefore, the defendant cannot successfully argue that it would be required to expend a great amount of effort and resources to ascertain the generally accepted principles of property law

and that the VA's sublease was limited by the term of the prime lease where the authorities relied upon by the plaintiff, and this Court represent "the best in modern decision and discussion."

■ Second, the applicable laws are binding on parties to a contract, in general, as well as in the context of a contract with the Federal Government, regardless of whether or not the laws are specifically incorporated into the contract. *See ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 751–53, 524 F.2d 680, 690 (1975). The rules governing the Federal Government's sublease with a private party are the same as the rules governing subleases between private parties. Therefore, the defendant in this case is bound by the law applicable to subleases, including the generally accepted principle that a sublease expires on the expiration of the prime lease even though the sublease states a longer term.

### C. Validity of the Allenfield/VA Lease.

■ The key issue in this case is whether or not the Allenfield/VA sublease [8] is still valid. "In general, the rights of the subtenant are measured by those of his sublessor. A sublessee can in no event have any greater rights against the lessor than were given by the original lease to the lessee." 51C C.J.S. *Landlord & Tenant* § 48(1), at 140 (1968); *see also KMS Fusion, Inc. v. United States*, 24 Cl.Ct. 582, 595 (1991) (noting that the terms of the prime lease control the sublease); 49 AM. JUR. 2D *Landlord and Tenant* § 1183 (1995) (finding that a sublessee cannot acquire greater rights in the use and enjoyment of the leased property than the original lessee had in the property); 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.701, at 382 (3d ed. 1990) ("A prime tenant may not sublet more than he has."); 51C C.J.S. *Landlord & Tenant* § 48(1), at 142 ("Anything which defeats the original tenant's estate will destroy the subtenant's estate.").

■ Specifically, with regard to the expiration of the term of the sublease:

A sublease that was made subsequent to the head lease is necessarily subject to the head lease. If the head lease falls the sublease falls if this happens by reason of some right of termination or cancellation given the prime landlord by the terms of the head lease. *The sublease falls with the head lease where the term of the prime lease is shorter than that of the sublease * * *.*

1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.703, at 385 (3d ed.1990) (emphasis added, footnote omitted); *see also* 49 AM. JUR. 2D *Landlord and Tenant* § 1185, at 921 (1995) ("The right of the sublessee to the possession of the premises, as against the original lessor, terminates with the lease or term of the original lessee * * *."); 2 RICHARD R. POWELL AND PATRICK J. ROHAN, POWELL ON REAL

---

8. This Court finds that the Allenfield/VA lease is properly characterized as a sublease to the LCIDA/Wagner lease (now the LCIDA/Allenfield lease), not as an assignment. According to Black's Dictionary, a sublease is "[a] lease executed by the lessee of land or premises to a third person, conveying the same interest which the lessee enjoys, but for a shorter term than that for which the lessee holds (as compared to assignment, where the lessee transfers the entire unexpired term of the leasehold to a third party). Transaction whereby tenant grants interests in leased premises less than his own, or reserves to himself reversionary interest in term." Black's Law Dictionary 1425 (6th ed.1990); *see also Thomas v. United States*, 205 Ct.Cl. 623, 632, 505 F.2d 1282, 1286–87 (1974).

Although, on its face, the Allenfield/VA lease extends beyond the term of the LCIDA/Allenfield prime lease, thus, suggesting that it is not a sublease, the prime lease contains an option to purchase the property subject to the lease, there-

by making the VA's lease a sublease because the possibility of a reversion to the owner (*i.e.*, Allenfield) exists. The Restatement (Second) of Property states: "[t]he tenant has made a sublease, even though the transfer is initially for the balance of the term [of the prime lease], if the right of possession of the leased property may return to him upon the occurrence of some event." RESTATEMENT (SECOND) OF PROPERTY § 15.1 cmt. i (1977); *see also Joseph Bros. Co. v. F.W. Woolworth Co.*, 844 F.2d 369, 372 (6th Cir.1988) (quoting *Cross v. Commercial Real Estate*, 16 Ohio N.P.(N.S.) 97, 97 (Cuyahoga Cty., C.P. 1914)); *cf. In re Lafayette Radio Elecs. Corp.*, 9 B.R. 993, 999 (Bankr.E.D.N.Y.1981); 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.403, at 335 (3d ed. 1990)("Where * * * a sublease for a term that projects into landlord's option period, the result has been held a sublease not an assignment."). Therefore, the Allenfield/VA lease is a sublease, not an assignment.

PROPERTY § 16.03[7][d], 16–86 (1997) ("Likewise, if a tenant creates a sublease, the sublease ends whenever the main lease terminates."); 51C C.J.S. *Landlord & Tenant* § 48(1), at 142 ("The termination of the primary lease operates as a termination of a sublease * * *.").[9]

In addition, "[a] subtenant has been said to be under a 'duty' to ascertain the terms of the headlease. This means merely that he is charged with knowledge of its terms." 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.701, at 375. "[T]his is true although the lease was not recorded and although the lessee had no actual knowledge of its contents." 51C C.J.S. *Landlord & Tenant* § 48(1), at 141.

Based on the above-stated general principles of law that represent "the best in modern decision and discussion," in this case, the VA, as sublessee, could not acquire greater rights against Allenfield, the sublessor/prime tenant, than Allenfield had in the prime lease after it was assigned to Allenfield by 21st Century. In addition, the Allenfield/VA sublease, which stated that it expired at the latest on February 10, 1999, actually ceased to exist when the prime lease terminated according to its terms on October 31, 1989, even though the sublease stated a longer term than the prime lease.[10] This termination of the VA's sublease was self-executing and did not occur because of some action on the part of Allenfield. It occurred by operation of law on October 31, 1989, well before Allenfield sought to exercise its option to purchase the Hamilton property.[11] *See Nybor Corp. v. Ray's Restaurants, Inc.*, 29 N.C.App. 642, 225 S.E.2d 609, 612 (1976).

In addition, the VA is charged with notice and was bound by the terms of the LCIDA/Wagner lease, including the provision that the lease expired at midnight on October 31, 1989.[12] The defendant cannot contend that it was not aware that the LCIDA/Wagner lease expired on October 31, 1989, because the LCIDA/Wagner lease was

---

9. Pennsylvania law, upon which the lease in question might be governed if the Federal Government was not a party, similarly states that "[a]ny person who is a sublessee shall be subject to the provisions of the lease between the lessor and the lessee." 68 PA.STAT. § 250.105 (West 1994); *see also In re Royal Yarn Dyeing Corp. (Paul Ruth Trading Co. v. Royal Yarn Dyeing Corp.)*, 114 B.R. 852, 856 (Bankr.E.D.N.Y.1990); *Scott v. Mullins*, 211 Cal.App.2d 51, 27 Cal.Rptr. 269, 272 (1962); *American Community Stores Corp. v. Newman*, 232 Neb. 434, 441 N.W.2d 154, 159 (1989).

10. Numerous lessors' and lessees' actions in this dispute have mistakenly assumed that the original LCIDA/Wagner lease extended beyond the termination date of October 31, 1989. First, Ms. Wagner, although representing herself as the owner of the Hamilton property and perhaps holding the intention of exercising her option to purchase the property from LCIDA, still had no legal authority to lease the property to the VA beyond her own eleven-year lease, which terminated on October 31, 1989. Second, Ms. Wagner's assignments of the LCIDA/Wagner lease, the Wagner/VA lease, and the option to purchase the property to 21st Century, did not change the fact that the LCIDA/Wagner lease would terminate on October 31, 1989, and LCIDA would remain the owner of the property. Third, the interests in the LCIDA/Wagner and Wagner/VA leases that Ms. Wagner assigned to 21st Century both ended on October 31, 1989, and 21st Century had no legal ability to assign its interest in the leases to Allenfield after October 31, 1989. All interests in the leases ended on October 31, 1989, and only LCIDA's ownership interest in the property and Allenfield's option to purchase the property remained.

Specifically, after October 31, 1989, Allenfield was not a lessee of LCIDA, the record owner, and all that Allenfield held was an option to purchase the Hamilton property. The VA, therefore, was never anything more than a holdover tenant after October 31, 1989, without power to extend its lease, as it purported to do on December 9, 1993. At most, the VA had a tenancy at sufferance after October 31, 1989.

11. In its Motion for Summary Judgment, the defendant states that "[t]he expiration of the lease between the owner of the premises, the Lehigh County Industrial Development Authority ("LCIDA"), and its lessee, (the Wagners and their successors) in 1989, has no effect upon the validity of the lease between the Government and Allenfield." (Def.'s Mot. for Summ. J. at 4.) However, the defendant cites no authority for that proposition and, as this Court found, *supra*, it is clear that the law is to the contrary.

12. In its Proposed Findings of Uncontroverted Facts, the plaintiff states that "[a]t midnight on October 31, 1989, the LCIDA/Wagner Primary lease expired." (Pl.'s Proposed Findings of Uncontroverted Fact at 5.) In response, the defendant states that it has "no objection" to that statement. (Def.'s Statement of Genuine Issues at 1.)

publicly recorded, and, therefore, the defendant was put on constructive notice of the terms of the prime lease. The current action simply resulted from the VA's own actions in executing a sublease for a term longer than was valid under the generally accepted principles of property law, without ascertaining the facts that it could have determined by exercising only the slightest diligence in reviewing the publicly recorded prime lease. *See Gulden v. Newberry Wrecker Serv., Inc.,* 154 Ga.App. 130, 267 S.E.2d 763, 765–66 (1980).

 Moreover, while the defendant contends that Allenfield was bound by the terms of the sublease with the VA because it expressly assumed and adopted the sublease, that proposition does not assist the defendant in its contention that the sublease is valid and binding until February 10, 1999. The general rule is that when a party is assigned a lease, it receives the benefits and assumes the burdens of the original contract between the parties, including any option to renew the lease. 51C C.J.S. *Landlord & Tenant* §§ 44(1), 58(2)(b). Allenfield was assigned the Wagner/VA lease and assumed and adopted all of the rights and responsibilities in that lease, including the VA's option to renew the lease for an additional five-year term. Implicit in the VA's lease was a provision that the term of the lease expired on October 31, 1989, the date that the prime lease expired.[13] Therefore, while Allenfield was bound by the terms of the Wagner/VA sublease, the sublease term still expired on October 31, 1989.[14]

In addition, Allenfield's June 4, 1990 letter to the VA that sought to persuade the VA to exercise its option to renew is without effect on the current action because the VA had no right under the law to exercise its option to renew the sublease for an additional five-year period. Furthermore, by June 4, 1990, Allenfield's lease with LCIDA had expired, and Allenfield had no authority or ability to sublet the property. This Court agrees that Allenfield is bound to the terms of the sublease because it expressly assumed and adopted the sublease; however, "[w]hen a prime tenant [Ms. Wagner] sublet a greater area and a longer term than [s]he had, a grantee [Allenfield] from the prime landlord, who took subject to the two leases of record, the prime lease [LCIDA/Wagner] and the sublease [Wagner/VA], was not bound by these excesses." 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.701, at 382. The prime lease and, therefore, the sublease *automatically* expired on October 31, 1989, approximately seven months before Allenfield attempted to persuade the VA to exercise its option to renew and approximately four years before the VA actually exercised its unenforceable option to renew. In sum, any renewal or attempted renewal of the sublease had no effect because the prime lease and the sublease had already expired according to the terms of the prime lease.

The defendant also contends in its motion for summary judgment that the plaintiff's current breach of contract argument involves a second attempt to manipulate the prime lease by purchasing the property to the detriment of the VA. The defendant claims that this is similar to the plaintiff's first attempt to manipulate the prime lease when it sought

---

**13.** In this case, when Allenfield assumed the Wagner/VA lease, the sublease was already limited to a term expiring no later than October 31, 1989 by virtue of the term in the LCIDA/Wagner prime lease, which was executed before Allenfield even became involved with the property.

**14.** Because Ms. Wagner had no legal right to lease the Hamilton property to the VA after October 31, 1989, her agreement to do so was unenforceable. Therefore, the VA's extension of its sublease for an additional five-year term was also unenforceable. As a result, the VA may have had the right to bring a breach of contract action against Ms. Wagner for subletting for a term beyond October 31, 1989. *See* 51C C.J.S. *Landlord & Tenant* § 49; 49 AM. JUR. 2D *Landlord and*

*Tenant* § 1179, at 917 (1995) ("A lessee of property is liable to the sublessee for subletting more than the lessee has a right to lease."); 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.701, at 382 ("[The prime tenant] is liable to his subtenant for subletting for a term beyond that of the prime lease if this leads to eviction or surrender of possession by the subtenant."). Allenfield would not be liable under this theory because, as an assignee of Ms. Wagner and 21st Century, Allenfield is not bound by the prior acts of its assignor, Ms. Wagner. *See* 51C C.J.S. *Landlord & Tenant* § 44(3), at 130 (stating that "[t]he assignee is not liable for breaches occurring prior to the assignment * * *.").

to enforce the reversionary interests of LCI-DA in the prior court proceedings before it (Allenfield) exercised its option to purchase the property. This Court finds that the defendant's manipulation argument fails for several reasons.

First, this is not a case where the prime tenant/sublessor voluntarily surrendered or terminated the prime lease in order to affect adversely the rights of the subtenant. *See Greenwich Village Assocs. v. Salle*, 110 A.D.2d 111, 493 N.Y.S.2d 461, 463–64 (1985); *Hessel v. Johnson*, 129 Pa. 173, 18 A. 754, 754–55 (1889). To the contrary, based on the facts before this Court, Allenfield has acted in good faith toward the VA during the entire term of its lease. *Cf.* 51C C.J.S. *Landlord & Tenant* § 48(2), at 147 ("[t]he sublessor has an obligation to act in good faith toward the sublessee; [ ] and he cannot plead his own breach in discharge of his obligation to continue rights granted the sublessee."). In addition, Allenfield did not take any action to cause the VA's lease to terminate or to expire because it expired according to the terms of the law, which universally state that a sublease expires on the expiration of the prime lease even if the sublease contains a longer term.[15]

Next, the defendant argues, and the Court agrees, *supra*, that the present action is not barred by *res judicata* or collateral estoppel based on the district court's prior decision, which "was clearly limited to the factual scenario then before it," (Def.'s Mot. for Summ. J. at 9.) However, the defendant now is attempting to use the doctrines of *res judicata* and collateral estoppel to make the district court's prior findings regarding manipulation binding on this Court in the present action. As this Court found, *supra*, the factual and legal issues in the present action are different from those issues that were before the district court. Therefore, the district court's findings regarding manipulation are also not binding in this case.

In addition, the defendant's manipulation argument fails because it is not based on any legal theory of manipulation, but is based solely on the district court's use of the term in its decision. As the defendant admits, "[b]y manipulation, we were referring to the underlying principle that the [district] court was addressing, rather than a legal doctrine of 'manipulation.' " (Def.'s Response to Pl.'s Supp. Br. at 7.) This Court's decisions are based on the legal doctrines set forth in the decisions of the United States Supreme Court, United States Court of Appeals for the Federal Circuit, and this Court, and are not based on mere "underlying principle[s]" of the district courts. Also, this Court cannot find any authority to support the defendant's theory of manipulation in this case, other than the use of the term in the district court's decision, which is not binding. Therefore, this Court finds that the defendant's manipulation theory is without legal merit.

Moreover, this Court disregards the defendant's manipulation theory because the case law relied on by the defendant to support a manipulation theory is inapplicable. In its brief, the defendant contends that "[t]he manipulation of the prime lease by the sublessor to the disadvantage of the subtenant has been condemned by the Pennsylvania Supreme Court," and quotes the district court's opinion, which refers to the Pennsylvania Supreme Court's decision in *Hessel v. Johnson*, 129 Pa. 173, 18 A. 754 (1889). (Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. at 9.) However, this Court has already determined that federal common law taking into account "the best in modern decision and discussion," controls and not Pennsylvania law by itself. Moreover, this Court found, *supra*, that *Hessel* is not applicable to this case because the plaintiff did not attempt to surrender voluntarily or to terminate the lease to the prejudice of the VA, rather the term of the lease simply expired on October 31, 1989. Therefore, the case law relied on by the defendant

---

**15.** On a related issue, the defendant contends that the plaintiff is improperly preventing the performance of the sublease by seeking a decision that the sublease expired on October 31, 1989. However, this Court finds that this argument is without merit because Allenfield took no action to prevent the performance of the terms of the sublease. To the contrary, the term of the sublease has always been limited, as a matter of law, by the term of the prime lease, which expired by its own terms on October 31, 1989.

to support a manipulation theory is inapplicable.

Finally, this Court finds that there was no attempt by the plaintiff to manipulate the lease. To the contrary, the plaintiff merely exercised its option to purchase the property. Therefore, this Court finds that the defendant's manipulation argument is wholly without merit.[16]

### D. Tenancy at Sufferance

Having concluded that the term of the Allenfield/VA sublease expired contemporaneously with the prime lease on October 31, 1989, this Court must now determine the VA's duty to vacate the property and whether or not its failure to vacate constitutes a breach of contract. The general rule is that "an implied duty to vacate is an inherent part of every fixed term lease agreement unless the parties explicitly express an intention to the contrary." *Prudential Ins. Co.*, 801 F.2d at 1299. In this case, there is no provision in the sublease that expresses an intention that the VA does not have an implied duty to vacate the property at the end of the term. Therefore, the VA had a contractual duty to vacate the property on October 31, 1989.

When a lessee has a contractual duty to vacate the property at the end of the lease term, it necessarily follows that such a failure to vacate is a breach of that contractual duty, which will subject the breaching party to liability for holding over. *Id.* at 1300; *see also* 51C C.J.S. *Landlord & Tenant* § 48(1), at 145 ("After termination of the head lease, the lessor may recover for the subsequent unauthorized use and occupancy of the premises by the sublessee."). In this case, the VA's sublease expired on October 31, 1989, and, by not vacating the Hamilton property, the VA became a holdover tenant. On October 31, 1989, LCIDA, as the fee owner of the property, possessed the right to demand that the VA pay reasonable rental value or abandon the property, but, because LCIDA did neither, the VA's continued possession of the property after October 31, 1989, should be characterized as a holdover rather than as a breach of contract.

In addition, "[w]here a subtenant holds over after the expiration of the original lease, he holds, with respect to the original lessor, merely as a tenant at sufferance." 51C C.J.S. *Landlord & Tenant* § 177, at 490. A tenancy at sufferance can be terminated at

---

**16.** This Court also finds the defendant's merger argument is without merit. In its Opposition to Plaintiff's Motion for Partial Summary Judgment, the defendant contends that "Allenfield's purchase created a prime lease with itself that merged with the sublease between Allenfield and the Government."

"The result is that now, instead of there being two leases, one between Allenfield and itself and the other between Allenfield and the Government, there is only one lease—between the Government and the owner of the premises. Logically this must be the result, since a party cannot lease with itself. Thus, the Pennsylvania provisions relied upon by plaintiff do not apply to the one remaining lease as there is no longer a sublease."
(Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. at 9.) Now that Allenfield is the owner, prime lessor, and sublessor, the defendant argues that "there is absolutely no legal impediment preventing [Allenfield] from providing to the Government all that was bargained for * * *." (Def.'s Mot. for Summ. J. at 9.)

However, it is a generally accepted principle of law that the common law doctrine of merger is not favored when it would be adverse to the interests of the party whose estates are merged. *See* 28 AM. JUR. 2D *Estates* § 375, at 582 (1995)

("The modern doctrine is that merger is not favored either at law or in equity."); 28 AM. JUR. 2D § 381, at 591 (1995) ("Where a merger is not beneficial to the person in whom the two interests are united, an intention that there shall be no merger will be inferred by the court."); 3 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.701, at 382 ("No merger occurs by union of the fee and sublease in the same hands."); 51C C.J.S. *Landlord & Tenant* § 257, 670 (stating that "a merger will not occur if there is a clear intention that the merger shall not take place, [] if it would be inimical to the interest of the party in whom the several estates have united * * *."). Therefore, in this case, the doctrine of merger will not be applied to the union of the fee ownership and the VA sublease by virtue of Allenfield's purchase of the property because it would be detrimental to Allenfield's interests and is not generally favored at law. Also, the self-executing expiration of the prime lease and sublease, on October 31, 1989, occurred before any merger could have taken place so there was no valid sublease that could have been merged. Moreover, there is a "legal impediment" to Allenfield's obligation to perform under the sublease; namely, that the sublease expired on October 31, 1989, when the prime lease expired according to its terms.

any time. 51C C.J.S. *Landlord & Tenant* § 182, at 493. The rental obligation of a tenant at sufferance is not based on the rent provisions set forth in the original lease between the parties, but is the "reasonable rental value of the property he occupies." 49 AM. JUR. 2D *Landlord and Tenant* § 369, at 326 (1995); *see also* 3 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 18.2, at 1103 (3d ed.1990). This Court finds that the VA became a tenant at sufferance after the expiration of the sublease on October 31, 1989, at which point, LCIDA could have either demanded that the VA pay reasonable rental value or vacate the property. Since the LCIDA failed to make either request, the VA continued paying rent as a tenant at sufferance until Allenfield purchased the property on September 8, 1994. Allenfield notified the VA shortly thereafter, by letter dated September 21, 1994, that it must vacate the property by October 15, 1994, or pay fair market rent. Therefore, the breach of contract occurred on October 15, 1994, when the defendant refused to pay reasonable rental value or vacate the property. Thus, this Court must separately determine what is the reasonable rental value of the Hamilton property from October 15, 1994, the date that Allenfield apprised the VA that it must vacate the property or be held liable for the fair market rental value,[17] until such time as the VA vacates the property.[18]

### E. Fifth Amendment Taking

■ In the alternative to its breach of contract claim, the plaintiff alleges that the VA's breach of contract for failure to vacate the property on October 15, 1994, constitutes a taking without just compensation in violation of the Fifth Amendment. The Federal Circuit has found, in a similarly argued circumstance, that lessors have an alternative avenue of relief under the takings clause of the Fifth Amendment against a Federal Government lessee who holds over after the expiration of the term of the lease. *See Prudential Ins. Co.*, 801 F.2d at 1300 n. 13. Therefore, a lessee who holds over after the expiration of the term of the lease and fails to vacate the property can be held liable to the lessor under a breach of contract theory for breaching its contractual duty to vacate the premises at the expiration of the lease, or, in the alternative, can be held liable under a takings theory for temporarily taking the lessor's property without just compensation.

■ "A taking occurs when the rightful property, contract, or regulatory powers of the Government are employed to control rights or property which have not been purchased." *Alde, S.A. v. United States*, 28 Fed.Cl. 26, 33 (1993). A temporary taking, which denies a landowner all use of his property for a finite period of time, requires just compensation in the form of the fair market rental value of the property. *First English Evangelical Luth. Church v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987); *Niagara Falls Bridge Comm'n v. United States*, 111 Ct.Cl. 338, 353, 76 F.Supp. 1018, 1019 (1948). In order to obtain just compensation, a plaintiff need not prove the Government's intent to take the property, but it need only prove that the "invasion of property rights resulting from governmental action was a natural and probable consequence of the governmental acts in question." *Cloverport Sand & Gravel Co. v. United States*, 6 Cl.Ct. 178, 201 (1984).

■ In this case, Allenfield seeks just compensation from the Government for its occupancy and use of the Hamilton property from October 15, 1994,[19] the date that the VA

---

17. While Allenfield purchased the property on September 8, 1994, it can only seek to collect for breach of contract or reasonable rental value from October 15, 1994, the date the VA was to vacate the property. *See Wilfong v. United States*, 202 Ct.Cl. 616, 624–25, 480 F.2d 1326, 1330 (1973).

18. The reasonable rental value should take into account any mitigation as a result of the VA's current rental payments pursuant to the terms of the sublease made directly to the mortgagee. *See* 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.704, at 391 (crediting the subtenant's payment of rent to the prime landlord as to its liability to the prime tenant/sublessor).

19. Although the sublease expired and, thus, the VA had the contractual duty to vacate the property on October 31, 1989, Allenfield could not demand that the Government vacate the property until it purchased the property. Thus, Allen-

was required to vacate the property or be liable for the current market rental value of the property. This Court agrees with the plaintiff and finds that the VA did physically occupy and use the Hamilton property after the term of the lease expired. This physical occupancy, and use by the VA, constitutes a temporary taking for which Allenfield is entitled to just compensation under the Fifth Amendment. See . Niagara Falls Bridge Comm'n, 111 Ct.Cl. at 355–56, 76 F.Supp. at 1021; Economic Dev. & Indus. Corp. v. United States, 13 Cl.Ct. 590, 603–04 (1987).

Specifically, the LCIDA/Wagner prime lease expired on October 31, 1989 according to its terms. As this Court found, the Allenfield/VA sublease also expired on October 31, 1989, based on the generally accepted principle of landlord-tenant law that states that the term of a sublease expires upon the expiration of the prime lease even though the sublease states a longer term. Therefore, after October 31, 1989 no valid and enforceable sublease existed, and the VA was contractually obligated to vacate the property. Nonetheless, the VA refused to vacate the property even after Allenfield apprised the VA that commencing on October 15, 1994, the VA would be liable for the current market rental value of the property if it chose to continue to hold over on the property. The VA's response to Allenfield's notice to vacate letter was that it did not have to vacate the property in light of the district court's previous decision, regardless of the fact that, subsequent to the district court's decision, Allenfield had purchased the property and was now the full fee estate owner. Regardless of the VA's reasons for failing to vacate the property,[20] the fact is that the VA has not vacated the property as of this date, which is more than three years after Allenfield notified the VA that it must vacate the property on or before October 15, 1994, or be held liable for the current market rental value of the property.

Allenfield, as the owner of the fee estate private property involved here, has the right to exclude others, including the Federal Government, from its property and the Government's occupation and use of the Hamilton property constitutes a taking of that right. See Goodwyn v. United States, 32 Fed.Cl. 409, 417 (1994). Under such circumstances, where the Federal Government occupies private property without the consent of the owner, it is liable for the fair market rental value of the property under the Fifth Amendment. See Niagara Falls Bridge Comm'n, 111 Ct.Cl. at 353, 76 F.Supp. 1018. Therefore, this Court finds that the VA's occupation and use of the Hamilton property from October 15, 1994, until such time as it vacates the property, is a temporary taking without just compensation in violation of the Fifth Amendment.[21]

### F. Damages

While this Court finds that the VA's failure to vacate the Hamilton property, constitutes both a breach of contract and a temporary taking, the plaintiff's recoverable damages will be based on the defendant's breach of contract and not on the alternative takings claim. "[T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract * * * [and] interference with such contractual rights generally gives rise to a breach claim not a taking claim." Sun Oil Co. v. United States, 215 Ct.Cl. 716, 770, 572 F.2d 786 (1978); see also J.J. Henry Co. v. United States, 188 Ct.Cl. 39, 46, 411 F.2d 1246 (1969) (citing Klebe v. United States, 57 Ct.Cl. 160 (1922), aff'd, 263 U.S. 188, 44 S.Ct. 58, 68 L.Ed. 244 (1923)). This case originated as a breach of contract claim

---

field's "actionable period" for the taking did not begin until it provided notice to the VA in its September 21, 1994 letter that it must vacate by October 15, 1994, or thereafter pay fair market rental rates. See Wilfong v. United States, 202 Ct.Cl. 616, 624–25, 480 F.2d 1326, 1330 (1973).

**20.** It is clear to this Court that the VA sought to stay on the property under the sublease until February 10, 1999 in order to take advantage of

the low interest and subsidized lease rates that it obtained through LCIDA's prior ownership of the property.

**21.** If recoverable damages were to be based on the temporary taking, this Court would consider mitigation of damages, such as the VA's current rental payments for the Hamilton property that were made directly to the mortgagee. See supra note 18.

and the finding of a temporary taking provides an alternative for this Court to compensate the plaintiff.[22]

In *Plaintiffs In Winstar–Related Cases v. United States*,[23] the Court noted the crucial distinction between a Fifth Amendment takings claim and a claim for a breach of contract. A party to a valid contract has an absolute right not to have that contract violated, and, unlike takings claims, the existence of the breach itself, not the degree of harm caused by the breach, is the essential component in the awarding of damages. *Id.* at 187. Furthermore, as a rule, a contract implicitly contains a promise to pay damages in the event of a breach. *Id.* at 187 n. 9. By contrast, the Fifth Amendment merely provides a remedy under circumstances in which no other remedy is available and, thus, is not applicable to Allenfield's injury, which is redressable in contract. *Id.*[24] Therefore, because the VA breached its contract, the plaintiff is entitled to the reasonable rental value of the property, in an amount to be determined, from October 15, 1994, the date the plaintiff requested the VA to vacate the property, until such time as the VA vacates the property.

In final summary, this Court finds that the claims and issues in this action are not barred pursuant to *res judicata* or collateral estoppel in light of the district court's prior decision. In addition, this Court finds that, while federal common law would generally apply to a dispute involving a lease with the Federal Government, such as the sublease between Allenfield and the VA, federal law is not determinative of the validity of the VA's lease in this case. Therefore, this Court applied "the best in modern decision and discussion" to determine the extent of the parties' respective obligations under the sublease and whether or not the VA breached the lease when it failed to vacate the property after October 15, 1994. Finally, this Court finds that the VA's sublease for the Hamilton property expired on October 31, 1989. On October 31, 1989, the VA had a contractual duty to vacate the property, but only Allenfield enforced its reversionary rights after purchasing the property on September 8, 1994, and notifying the VA that as of October 15, 1994 it must begin paying fair market rental rates or vacate the property; the VA's failure to do either constituted a breach of contract. The sublease's October 31, 1989 expiration was self-executing and there was no manipulation of the leases by Allenfield. In the alternative, this Court finds that the VA's failure to vacate the property on October 31, 1989 constitutes a temporary taking without just compensation in violation of the Fifth Amendment. Therefore, the plaintiff is entitled to the reasonable rental value of the property (or just compensation) in an amount to be determined from October 15, 1994, the date by which the VA was to vacate the property, until such time as the VA vacates the property.

## CONCLUSION

For the foregoing reasons, the plaintiff's Motion for Partial Summary Judgment is granted, and the defendant's Motion for Summary Judgment is denied. The parties are to advise the Court within sixty (60) days of their intentions in regard to the issue of damages in this matter.

---

**22.** In *Sun Oil Co.*, the Government's interference with the plaintiff's lease rights were grounded in an effort to operate within the framework of the lease, not to take the plaintiff's property rights, and if the Government's interferences were unjustified or unreasonable, the plaintiff's rights emanated from the lease agreement, not the Fifth Amendment. *Sun Oil Co.*, 215 Ct.Cl. at 770, 572 F.2d 786. Moreover, in this case, Allenfield's takings claim only arose after the VA breached the contract by failing to vacate the property on October 31, 1989, because the VA believed it had a valid lease through the year 1999.

**23.** 37 Fed.Cl. 174 (1997).

**24.** *Compare Heydt v. United States*, 38 Fed.Cl. 286, 305, 308 (1997)(finding liability under the Fifth Amendment for the Government's occupation and use of a private facility because no implied-in-fact contract existed) *and Niagara Falls Bridge Comm'n v. United States*, 111 Ct.Cl. 338, 355–56, 76 F.Supp. 1018 (1948) (basing liability on an implied contract rather than a Fifth Amendment taking and thereby requiring the United States to pay the reasonable rental value of the plaintiff's property because of its continued occupation).