The SALT RIVER PIMA–MARICOPA
INDIAN COMMUNITY, et al.,
Plaintiffs,

v.

UNITED STATES, Defendant.

No. 08–354C.

United States Court of Federal Claims.

March 30, 2009.

Keith M. Harper, Kilpatrick Stockton, LLP, Washington, D.C., for the plaintiffs.

J. Reid Prouty, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for the defendant, with whom was Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

Plaintiffs, the Salt River Pima–Maricopa Indian Community [1] (hereinafter, the Community) and 495 individual members of the Community, individually and as a proposed class,[2] seek money damages from the United

---

1. The amended complaint describes the Salt River Pima–Maricopa Indian Community as "a federally recognized Indian tribe with more than 8,600 enrolled members," and as "the beneficial

owner of approximately 29.6178 acres of land included within the subject right-of-way."

2. In the complaint, the plaintiffs Dorinee Ann Andrews, Thelma Kisto, Ronald Leo Mack, Del-

States Western Area Power Administration (WAPA) for breach of a "Contract and Grant of Easement." The "Contract and Grant of Easement," made pursuant to an Act of Congress approved June 17, 1902 (Pub.L. No. 57–161, ch. 1093, 32 Stat. 388 (1902)), is dated August 1, 1949 and was entered into between the United States and the Indian Allotees and owners of the allotments and lands on the Salt River Indian Reservation described in the "Contract and Grant of Easement." According to the amended complaint, the Community gave WAPA's predecessor in interest, the Bureau of Reclamation, United States Department of Interior (BOR), a fifty-year right-of-way for the erection and operation of an electric transmission line across land held in trust for the benefit of plaintiffs. The BOR began construction of a transmission line after the Secretary of the Interior had provisionally authorized the BOR to survey and commence construction on March 29, 1950. On December 17, 1951, The Commissioner of Indian Affairs, D.S. Myer, as delegate of the Secretary of the Interior, endorsed on a map of the right-of-way attached to the "Contract and Grant of Easement," that the transmission line right-of-way was "approved for a period not to exceed 50 years from March 29, 1950."[3] Also according to the amended complaint, regulations in place at the time the "Contract and Grant of Easement" was approved limited all easements on Indian land to a term not to exceed fifty years. After the enactment of the Department of Energy Organization Act of 1977 (1977 Act, Pub.L. No. 95–91, 91 Stat. 578 (1977) (codified at 42 U.S.C. § 7152)), the BOR's interest in the right-of-way was transferred to WAPA.

According to the amended complaint, on March 29, 2000, the "Contract and Grant of Easement" for the right of way expired by

its terms and no steps to extend or renew it were taken. According to the information currently before the court, seven years later, on October 31, 2007, the Community sent a demand letter to WAPA requesting WAPA immediately to vacate the right-of-way, remove the transmission lines and restore the affected property. The Community included a demand in the amount of $129,000,000.00 in damages. Subsequently, in a letter dated November 6, 2007, the Community filed a claim with WAPA pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–613 (2000) (CDA). The CDA claim letter described the original grant of easement, noting that federal regulations limit right-of-ways on Indian land to fifty years. The Community requested damages in the amount of $9,511,372.00 and certified the claim, citing section 605 of the CDA. On February 12, 2008, WAPA responded to the plaintiffs' November 6, 2007 claim letter, rejecting the Community's $9,511,372.00 claim because it was "not clear" that a valid contract claim existed. The claim also was rejected because the Community had not submitted the claim within the six-year CDA statute of limitations, given the allegation that the right-of-way was alleged to have expired on March 29, 2000 and that the claim was submitted to WAPA in November, 2007. *See* 41 U.S.C. § 605(a); *see also* 48 C.F.R. § 33.206 (Oct. 1, 2007).

Subsequently, the plaintiffs filed an action in this court and filed a concurrent action sounding in tort for trespass and nuisance in United States District Court of Arizona. In response to the action in this court, the government filed a Motion to Dismiss the Amended Complaint. The government argues that this court lacks jurisdiction because the claims are not covered under the CDA and are time barred by the Tucker Act's statute of limitations.

---

berta Phillips, Lawrence John Robinson, and Willardine Ione Sampson asked to file the action on their own behalf and as proposed representatives of a Class. *See* Rule 23 of the Rules of the United States Court of Federal Claims (RCFC). The request for Class certification was deferred until after a decision on the jurisdictional issues raised by the government's Motion to Dismiss addressed in this opinion.

**3.** The parties appear to agree that calculation of the fifty-year term of the "Contract and Grant of Easement" should commence on March 29, 1950. The court notes that the record reflects that although Commissioner Myer's endorsement on the map attached to the "Contract and Grant of Easement" was dated March 29, 1950, the "Contract and Grant of Easement" is dated August 1, 1949. In the instant case, however, the disparity in dates is not significant given the operative dates at issue.

## DISCUSSION

*Standard of Review*

The plaintiffs claim jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 601–613, as well as the Tucker Act, 28 U.S.C. § 1491 (2000) and the Indian Tucker Act, 28 U.S.C. § 1505 (2000). "Subject matter jurisdiction may be challenged at any time by the parties, or by the court sua sponte." *Folden v. United States*, 379 F.3d 1344, 1354 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2004), *cert. denied*, 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005); *see also Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed.Cir.2008); *Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (Fed.Cir.1993)); *United States v. Newport News Shipbuilding and Dry Dock Co.*, 933 F.2d 996, 998 n. 1 (Fed.Cir.1991); *North Star Alaska Hous. Corp. v. United States*, 76 Fed.Cl. 158, 185, *appeal dismissed*, 226 Fed.Appx. 1004 (Fed.Cir.2007). "In fact, a court has a duty to inquire into its jurisdiction to hear and decide a case." *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1342 (Fed.Cir.2001) (citing *Johannsen v. Pay Less Drug Stores Northwest, Inc.*, 918 F.2d 160, 161 (Fed.Cir.1990)); *see also View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 963 (Fed.Cir.1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not.").

Pursuant to Rule 8 of the Rules of the United States Court of Federal Claims (RCFC) and Rule 8 of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief...." RCFC 8(a)(1), (2); Fed.R.Civ.P. 8(a)(1), (2); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed.Cir.)

(citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)), *reh'g denied* (Fed.Cir.1997); *see also Edelmann v. United States*, 76 Fed.Cl. 376, 379 (2007). However, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed.Cir.1998); *see also McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1363 n. 9 (Fed.Cir.2007) (quoting 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1286 (3d ed.2004)); *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981) ("[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed.Cir.2006); *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed.Cir.2002), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed.Cir.2002); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1338 (Fed.Cir.2001) (quoting *New Valley Corp. v. United States*, 119 F.3d 1576, 1580 (Fed.Cir.1997)), *cert. denied*, 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed.Cir.2000).

The Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2000). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (citing *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)), *reh'g denied*, 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976); *see also Greenlee County, Ariz. v. United States*, 487 F.3d 871, 875 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2007), *cert. denied*, — U.S. —, 128 S.Ct. 1082, 169 L.Ed.2d 810 (2008); *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed.Cir.1999); *Stinson, Lyons & Bustamante, P.A. v. United States*, 33 Fed.Cl. 474, 478 (1995), *aff'd*, 79 F.3d 136 (Fed.Cir.1996).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States." *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *see also Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d at 1343 ("[P]laintiff must ... identify a substantive source of law that creates the right to recovery of money damages against the United States."); *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. at 605, 372 F.2d at 1007. To prove that a statute or regulation is money mandating, plaintiff must demonstrate that an independent source of substantive law relied upon "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. at 217, 103 S.Ct. 2961 (quoting *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948 and *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. at 607, 372 F.2d at 1009); *see also Hamlet v. United States*, 63 F.3d 1097, 1107 (Fed.Cir.), *reh'g denied*, en banc suggestion declined (Fed.Cir.1995), *cert. denied*, 517 U.S. 1155, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996). "Additionally, the specific authority granting money relief must be distinct from the Tucker Act itself." *Cottrell v. United States*, 42 Fed.Cl. 144, 152 (1998). "If the court's conclusion is that the source as alleged and pleaded is not money-mandating, the court shall so declare, and shall dismiss for lack of jurisdiction, a Rule 12(b)(1) dismissal—the absence of a money-mandating source being fatal to the court's jurisdiction under the Tucker Act." *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed.Cir.2005); *see also Doe v. United States*, 74 Fed.Cl. 794, 796 (2006).

In the complaint, the plaintiffs invoke jurisdiction under the Contract Disputes Act, the Tucker Act, and the Indian Tucker Act. The Tucker Act, 28 U.S.C. § 1491, gives this court jurisdiction over issues that arise under the CDA, including "any claim by or against, or dispute with a contractor ... including a dispute concerning termination of a contract, rights in tangible or intangible property...." 28 U.S.C. § 1491(a)(2).

By its terms, the CDA gives this court jurisdiction to hear claims relating to "express or implied contract ... entered into by an executive agency for(1) the procurement of property, other than real property in being...." 41 U.S.C. § 602(a). As enacted in 1978, the CDA also included a provision which stated:

> This Act shall apply to contracts entered into one hundred twenty days after the date of enactment. Notwithstanding any provision in a contract made before the effective date of this Act, the contractor may elect to proceed under this Act with respect to any claim pending then before the contracting officer or initiated thereafter.

Pub.L. No. 95–563, § 16, 92 Stat. 2391 (1978). In *Jackson v. United States Postal Service*, the court applied this provision, as follows:

> The lease here was executed in August 1978 for a period commencing in January 1979, before the Act became effective. The renewal option was exercised in 1983, after the Act went into effect. If USPS's exercise of the option clause confected a new lease, the Act applies to it; if it merely continued the 1979 lease in effect, plaintiffs could either proceed under the Act or

invoke the district court's concurrent jurisdiction.

*Jackson v. United States Postal Service,* 799 F.2d 1018, 1022 (5th Cir.), *reh'g denied* (5th Cir.1986); *see also Forman v. United States,* 767 F.2d 875, 877 (Fed.Cir.1985) (a case in which the parties proceeded under the CDA when interpreting a 1960 lease).

■ The plaintiffs' claims in this court are not barred by the CDA six-year statute of limitations. The Federal Acquisition Streamlining Act of 1994 (FASA) amended the CDA to require that any claim brought under the CDA be initiated with a contracting officer within six years of the accrual of such claims. Pub.L. No. 103–355, § 2351, 108 Stat. 3322 (1994). Prior to FASA, the CDA prescribed a one-year statute of limitations for initiation of a lawsuit in federal court, or ninety days to bring a claim before a contract board following a contracting officer's final decision. Pub.L. No. 95–563, §§ 7, 10(a)(3), 92 Stat. 2385, 2388 (1978). Section 10001 of the FASA stated that the amendments contained in the act would be implemented in a manner prescribed in regulations promulgated pursuant to the FASA. Pub.L. No. 103–355, § 10001, 108 Stat. 3404 (1994). The Office of Federal Procurement Policy (OFPP) subsequently issued a rule in the Federal Acquisition Regulation (FAR) implementing the FASA's amendments. *See* 48 C.F.R. § 33.206 (1996). The relevant Federal Acquisition Regulation requires that "[c]ontractor claims shall be submitted, in writing, to the contracting officer for a decision within 6 years after accrual of a claim, unless the contracting parties agreed to a shorter time period. This 6–year time period does not apply to contracts awarded prior to October 1, 1995." *Id.*

The FAR comported with the statute, the FASA, which stated that any contract "in existence on the date of the enactment of this Act" could be subject to a shorter period for submitting a claim, if that time period was stated in the contract. Pub.L. No. 103–355, § 2351(a)(2), 108 Stat. 3322 (1994). The contract currently under review by this court is silent regarding disputes, with no period for initiation of a dispute specified. As enacted, the FASA also was silent as to the retroactivity of the statute of limitations and left it to the OFPP to decide whether or not to implement retroactively. The OFPP decided not to make the statute of limitations retroactive, and as a result, the statute of limitations does not apply to contracts entered into before October 1, 1995.

In *Sucesion J. Serralles, Inc. v. United States,* the court described the evolution of the statute of limitations ground rules in the CDA and its implementing regulations, as follows:

> From its enactment in 1978 until 1995, "the CDA provided no limitations period in which claims must be presented (or certified) to the CO [contracting officer]." *Board of Governors of University of North Carolina v. United States,* 10 Cl.Ct. 27, 30 (1986). Not until the passage of the 1994 amendments to the Contract Disputes Act was a time period introduced, mandating that contractor claims against the government (as well as government claims against the contractor) "shall be submitted within 6 years after the accrual of the claim." Sec. 2351(a)[ (1) ] of the Federal Acquisition Streamlining Act of 1994 amending, 41 U.S.C. § 605(a), P.L. 103–355, 108 Stat. 3243, 3322, approved October 13, 1994. The 1994 amendments were applicable to contracts awarded on or after October 1, 1995, as specified in implementing regulations issued by the Office of Federal Procurement Policy in September 1995. FAR 33.206(b), 48 C.F.R. § 33.206(b) (1996). The regulations denied retroactive application of the six-year statute of limitations to contracts awarded before October 1, 1995. See *Motorola, Inc. v. West,* 125 F.3d 1470, 1473 (Fed.Cir. 1997).

*Sucesion J. Serralles, Inc. v. United States,* 46 Fed.Cl. 773, 783 (2000) (brackets in original); *see also Parsons Transp. Group v. United States,* 84 Fed.Cl. 779, 781 (2008) (denying a motion to dismiss based on the CDA six-year statute of limitations because the contract was entered into before the 1994 amendments, and stating, "[a]lthough the CDA now contains a six-year statute of limitations of its own, that provision does not

apply here because this contract was awarded before October 1, 1995.").

In sum, the general six-year statute of limitations also is inapplicable to the instant case, *see* 28 U.S.C. § 2501 (2000), because the contractor has elected to proceed under the CDA. On a CDA contract entered into prior to October 1, 1995, the current CDA six-year statute of limitations also does not apply. *See Pathman Constr. Co., Inc. v. United States,* 817 F.2d 1573, 1575, 1580 (Fed.Cir.1987); *Tuttle/White Constructors, Inc. v. United States,* 228 Ct.Cl. 354, 358–59, 656 F.2d 644, 647 (1981). Thus, plaintiffs' complaint is timely filed in this court.

■ Plaintiffs allege that the United States breached the "Contract and Grant of Easement" between the parties when the government did not vacate the right-of-way at the expiration of the agreement. The plaintiffs allege that the government had a duty to vacate the right-of-way at the expiration of the signed agreement. In *Prudential Insurance Company v. United States,* 801 F.2d 1295 (Fed.Cir.1986), cert. denied, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987), the court analyzed plaintiffs contention "that a lease for a fixed term obligates the lessee to vacate at the end of that term." *Prudential Ins. Co. v. United States,* 801 F.2d at 1297. The Federal Circuit stated, "[w]e conclude that, due to definite term of the lease and the nature of the landlord-tenant relationship, an implied duty to vacate is an inherent part of every fixed term lease agreement unless the parties explicitly express an intention to the contrary." *Id.* at 1299; *see also Allenfield Assoc. v. United States,* 40 Fed.Cl. 471, 486 (1998) (stating the general rule that there is an implied duty to vacate as an inherent part of every lease, that upon a failure to vacate the tenant became a holdover tenant, and that a breach of the contract occurred when the holdover tenant refused to pay reasonable rental value or vacate the property (citing *Prudential Ins. Co. v. United States,* 801 F.2d at 1299–1300)). The Federal Circuit in Prudential reflected that holding otherwise would "def[y] logic and precedent for interpreting contracts," and would read out of the agreement the lease expiration or termination date. *Pru-*

*dential v. United States,* 801 F.2d at 1299. The Prudential court arrived at this conclusion based on an analysis of modern landlord tenant law and principles of contract interpretation. *Id.* at 1298–1300.

In the instant case, the government continued to use the easement past the fifty-year term for which it had a contractual easement on the plaintiffs' land. By holding over past the term of the easement, not paying a reasonable rent and not vacating the property, the government, absent special circumstances, would appear to have become responsible for the damages that resulted from the holdover tenancy. *See id.* at 1300 (holding that "for damages to be recoverable as consequential or special, they must be foreseeable by the tenant at the time the lease agreement is executed."); *Allenfield v. United States,* 40 Fed.Cl. at 486 ("[I]t necessarily follows that such a failure to vacate is a breach of that contractual duty, which will subject the breaching party to liability for holding over." (citing *Prudential v. United States,* 801 F.2d at 1300)).

In its filing in this court, the government, in fact, cites *Prudential v. United States,* 801 F.2d at 1298–99 and states, "[w]e agree that *Prudential* created an implied contractual duty to vacate at the conclusion of the contract period. . . ." Without supporting authority or further explanation, however, the government also attempts to argue that even though a duty may exist, "there is no reason to impose this alleged contractual breach upon a time-period in which the contract expired and no longer bound the parties." Perhaps, the government makes this argument to support its statute of limitations argument and to anticipate and oppose a timeliness argument by plaintiffs regarding when the suit was filed on the basis of a continuing claim theory. In this case, however, the statute of limitations issue has been disposed of above in favor of plaintiffs based on the applicable statutes and regulations, not based on reliance of a continuing claim. Certainly, the government is not suggesting that no duty to vacate based on a contractual breach can be enforced after the contract expiration date.

■ The other jurisdictional issue to be decided is whether the "Contract and Grant of Easement" is covered by the CDA. The CDA applies to "any express or implied contract ... entered into by an executive agency for(1) the procurement of property, other than real property in being...." 41 U.S.C. § 602(a). An easement entered into by contract, like any other agreement, is contractual in nature, defining the relationship of the parties and their respective rights and remedies. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434–35 (Fed.Cir.1996). In *McAbee,* the government entered into a five-year, right-of-way easement, which included the right to deposit fill material on the plaintiff's land. *Id.* at 1433. Following the termination of the agreement, the plaintiff filed a tort action in the United States District Court for the Northern District of Alabama against the government for depositing excessive amounts of spoil material on his land. *Id.* The government argued that the District Court did not have jurisdiction because the claim was essentially contractual in nature, and appealed the denial of their motion. *Id.* The Federal Circuit reversed the District Court and remanded with instructions to transfer the case to the United States Court of Federal Claims. *Id.* The contract granting the easement was treated as a contract like any other. Similarly, in the instant case, the easement defining the relationship between the parties was contractual in nature.

The government also argues that the easement created by the "Contract and Grant of Easement" should be considered "real property in being" and, therefore, not covered by the CDA. The government states:

This property right, of course, existed prior to the "contract and grant of easement," it merely had not yet been carved from plaintiffs' other rights to the property in order to be granted to the United States. Thus, the "contract and grant of easement" at issue in this case was the vehicle for obtaining the "real property in being," not the property interest procured in the first place.

In support, the government asserts that the plain language of the CDA and the Office of Federal Procurement Policy Act, 41 U.S.C. § 405 (2000), as well as their legislative histories, support a conclusion that an easement is "real property in being." The government argues that because the easement could be accomplished by eminent domain, the legislative history of the CDA suggests that such property interests were not intended to be covered by the CDA. This court is not persuaded by the government's arguments and, for the following reasons, finds that the "Contract and Grant of Easement" is not the transfer of "real property in being" and, therefore, is subject to CDA jurisdiction.

As noted above, the CDA applies to "any express or implied contract ... entered into by an executive agency for(1) the procurement of property, *other than real property in being* ...." 41 U.S.C. § 602(a) (emphasis added). The legislative history of the CDA does not assist the government's arguments. The United States Court of Appeals for the Federal Circuit has previously noted that the legislative history of the CDA "contains little illuminating Congress' intended meaning of the phrase 'real property in being.' The committee reports are silent." *Forman v. United States,* 767 F.2d at 878. The Federal Circuit drew attention to the floor debate during which Congressman Kindness essentially repeated the statutory words, with the addition of an unexplained additional phrase which also did not define the meaning of "real property in being." The Congressman stated: " '[t]he procedures and remedies set down in the bill are applicable to all express or implied contracts entered into by the United States for (1) the procurement of property (other than the procurement of real property in being which is governed by the laws of eminent domain).' " *Id.* (citing 124 Cong. Rec. 31,645 (1978)). The Federal Circuit concluded: "[t]o the extent that this single remark is probative, it supports the conclusion that Congress did not intend lease agreements to fall within the 'real property in being' exception of § 3(a)(1)." *Forman v. United States,* 767 F.2d at 878.

In *Forman,* the Federal Circuit found the government's reference to the Federal Procurement Policy Act not much more instructive. This Act created the Office of Federal

Procurement Policy within the Executive Office of the President to devise guidelines on procurements entered into by executive branch agencies, and includes "a list of contracts to which the statute applies, which is in pertinent parts identical to the corresponding section (§ 3) of the Disputes Act." *Id.; see* 41 U.S.C. § 405(a)(1). According to the Federal Circuit, the substantial similarity of this phrasing in both the Federal Procurement Policy Act and the CDA caused the Federal Circuit to assume that Congress intended them to have the same meaning in the two acts. *Forman v. United States,* 767 F.2d at 878.

The Senate Report accompanying the Federal Procurement Policy Act includes the following:

> Procurement under [§ 6(a)] covers property ... and construction, alteration, repair or maintenance of buildings and other forms of real property, but excludes real property in being. Accordingly, the acquisition of a fee, easements, leases, or other interests in existing buildings and land would not be subject to the policies and regulations promulgated by OFPP.

S.Rep. No. 93–692 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 4589, 4599 (brackets and omissions in original).

In *Forman,* the Federal Circuit used this limited legislative history to reject the government's argument and to exclude newly formed leases from the definition of "real property in being." The court wrote:

> "Acquisition of" a lease is not the same thing as "entering into" a lease. The Report's language apparently refers to the procurement of existing interests—fees, easements, leases, etc.—and not the initial creation of these interests. A leasehold does not exist until a lease is entered into, and by entering into a lease the Government does not acquire a preexisting interest in the land; it establishes a new one. Thus, the Policy Act's language excluding contracts to procure "real property in being" fails to apply to newly-created lease agreements, and they fall within the purview of that statute and of the corresponding provisions of the Contract Disputes Act.

*Forman v. United States,* 767 F.2d at 879. The *Forman* court, therefore, held that a lease executed by the government which created a new property interest was subject to the CDA, apparently equating the words "in being" with the concept of "in existence." *See id.*

In a footnote, the Federal Circuit also added that: "If we were to put legislative history (both of the Policy Act and of the Contract Disputes Act) wholly aside, we would reach the same conclusion from our bare terms of the statutes because leases are normally considered within the realm of contracts." *Id.* at n. 4 (citations omitted). In the case currently before this court, the plaintiffs and the government entered into a new contract to create an easement that had not previously existed before the parties signed the "Contract and Grant of Easement." The government did not acquire a pre-existing easement. The document signed by the parties created a new relationship, in this case for a previously undefined easement.

The analysis resulting in the distinction between acquiring an existing property interest and entering into a new one was adopted subsequently in *Coconut Grove Entertainment, Inc. v. United States,* in which the court refused to take CDA jurisdiction because of the manner in which the interest was acquired. *Coconut Grove Entm't, Inc. v. United States,* 46 Fed.Cl. 249 (2000). The court stated:

> As the successor-in-interest to the landlord's interest in a pre-existing lease, the USPS did not establish a new property interest. Rather, the USPS procured an existing interest in real property—"real property in being"—as construed by the Federal Circuit in *Forman.* Because the language of the CDA expressly excludes such a procurement from its coverage, this court lacks jurisdiction in this case.

*Id.* at 254; *see also Bonneville Assoc. v. United States,* 43 F.3d 649, 653–55 (Fed.Cir. 1994) (applying the CDA to a mixed contract involving conveyance of a pre-existing property interest and repair and alteration of the building, noting that real property transac-

tions are not subject to the CDA when they convey title to existing property and that the contract for repair was subject to CDA jurisdiction, but giving the General Services Board of Contract Appeals jurisdiction over the entire mixed case, after assessing the policy reasons for not separating the two claims); *Hamza v. United States*, 31 Fed.Cl. 315, 320 (1994) (" 'Real property in being,' which is excluded from the scope of the statute, refers to procurement of existing interests," therefore, finding the lease at issue subject to the CDA); *Spodek v. United States*, 26 F.Supp.2d 750, 756 (E.D.Pa.1998) (applying the CDA "[b]ecause Lease I and Lease II are leasehold contracts entered into by the USPS, which created a new interest in the land, Lease I and Lease II are express contracts for the procurement of property, other than real property in being, which fall within the CDA."). All the above cited cases cited and followed *Forman v. United States*, 767 F.2d 875.

In the case currently before the court, the 1949 "Contract and Grant of Easement" created an easement in favor of the United States for the BOR to construct, operate and maintain electric transmission lines over lands in the possession of the Salt River Pima–Maricopa Community. The land over which the easement and right-of-way was granted was in possession of the Community when the easement was created. There is no evidence in the record that the easement on the Salt River Pima–Maricopa Community existed prior to the conveyance to the BOR. The "Contract and Grant of Easement" to the United States for the BOR to use to construct, operate and maintain an electric transmission line was the result of a new contract between the United States and the Community for a new development project. At the time the contract was entered into, a new property interest was created and the United States paid for the easement right-of-way. The "Contract and Grant of Easement" constituted a newly created property interest, protected from interference by third

parties. Prior to the "Contract and Grant of Easement," no such property interest existed at the site in question and, therefore, was not "in being." *Black's Law Dictionary* defines an easement as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose[.]" *Black's Law Dictionary* (8th ed.2004). The *Third Restatement of Property: Servitudes* defines easement as "a non possessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." *Restatement (Third) of Prop.: Servitudes* § 1.2 (2000).

The government asserts that, unlike a lease, an easement can be obtained by eminent domain, thus arguing that easements are excluded from the CDA, notwithstanding the Federal Circuit's *Forman* decision. According to the government, the availability of eminent domain to create easements and the entitlement to just compensation when this is done, as opposed to the absence of that eminent domain power to create a lease, should classify the easement in the "Contract and Grant of Easement" as "real property in being." In this regard, the government attempts to rely on the single comment by Congressman Kindness. As noted above, Congressman Kindness stated: "The procedures and remedies set down in the bill are applicable to all express or implied contracts entered into by the United States for (1) the procurement of property (other than the procurement of real property in being which is governed by the laws of eminent domain)." *Forman v. United States*, 767 F.2d at 878 · (citing 124 Cong. Rec. 31,645 (1978)).[4] Congressman Kindness's general remarks are not sufficient in their content to be persuasive here. The *Forman* court makes a point of noting that the Senate Report accompanying the Policy Act "apparently refers to the procurement of existing interests—fees, easements, leases, etc.—and not the initial creation of these interests." *Id.* at 879.

---

4. *See also Forman v. United States*, 767 F.2d at 878, addressing the Kindness remarks with the Federal Circuit and stating, "the government enters into a lease by agreement ... not through exercise of eminent domain (or threat thereof).

To the extent that this single remark is probative, it supports the conclusion that Congress did not intend lease agreements to fall within the 'real property in being' exception of § 3(a)(1)."

616

Whereas an easement taken by eminent domain occurs upon the unilateral seizure by the government of an existing property right, albeit with a requirement to provide just monetary compensation, the creation of an easement through a vehicle such as the "Contract and Grant of Easement" at issue here is the product of a negotiated contract in which a new relationship and new property interest is created, also for value. The seizure of property by eminent domain is not subject to the CDA, but a negotiated contract with the government, creating an easement, is governed by the CDA. The government undertook to secure this easement, by agreement, using the same process it would have used to form any other lease. The "Contract and Grant of Easement" was approved and negotiated by the government and the affected landowners, the Salt River Pima–Maricopa Indian Community Council.

In order to recover money damages the plaintiff must assert a "money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." *Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d at 1343–45. The CDA is such a money-mandating statute that allows the plaintiffs to recover for the government's breach of contract.

> The Contract Disputes Act of 1978 ("CDA") is such a money-mandating statute. It authorizes this Court to adjudicate a claim for monetary damages arising from "any express or implied contract ... entered into by an executive agency for ... the procurement of construction, alteration, repair or maintenance of real property" filed within twelve months of a contracting officer's final decision concerning the claim. 41 U.S.C. §§ 602(a)(3), 609(a).

*United States Sur. Co. v. United States,* 83 Fed.Cl. 306, 309 (2008) (omissions in original); *see also Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d at 1343–44 (discussing how the CDA is a money-mandating statute). Accordingly, the plaintiffs have properly invoked jurisdiction of this court.

### CONCLUSION

For the foregoing reasons, the court denies the government's motion to dismiss. The "Contract and Grant of Easement" is subject to the CDA and jurisdiction is proper in this court. The plaintiffs' claims are not time barred by any applicable statute of limitations or contract term.

**IT IS SO ORDERED.**